September 24, 1999

Joseph M. Owen
Resident Representative
World Bank Resident
Mission in Georgia
18A Chonkadze Street
Tbilisi, Georgia

Subject: Grant No. 114-G-00-99-00154-00

Dear Mr. Owen:

Pursuant to the authority contained in the Foreign Assistance Act of 1961, as amended, the U.S. Agency for International Development (USAID) hereby grants to International Bank for Reconstruction and Development (IBRD) and International Development Association (IDA) (hereinafter referred to as the "Grantee"), the sum of seven hundred fifty-seven thousand eight hundred dollars ($757,800) to provide support for a program in Georgia as described in the Schedule of this grant and in Attachment 2, entitled "Program Description."

This grant is effective and obligation is made as of the date of this letter and shall apply to expenditures made by the Grantee in furtherance of program objectives during the period beginning with the effective date and ending December 31, 2001.

This grant is made to the Grantee on condition that the funds will be administered in accordance with the terms and conditions as set forth in Attachment 1 (the Schedule); Attachment 2 (the Program Description); and Attachment 3 (the Standard Provisions); all of which have been agreed to by your organization.

Please sign the original and all enclosed copies of this letter to acknowledge your receipt of the grant and the IBRD's agreement to its terms, and return the original and all but one copy to me.

Sincerely yours,

Michael Farbman
Grant Officer
USAID/Caucasus

Attachments:
1. Schedule
2. Program Description
3. Standard Provisions

ACKNOWLEDGED:
International Bank for Reconstruction and Development and International Development Association
BY: ______________________________
TITLE: ______________________________
DATE: ______________________________

AMT: $750,000.00
APP: 729/01093
BPC: WNI9-99-22114-KG13
RCN: T909010
EOCC: 54101

FUNDS AVAILABLE
DATE 9/24/99

FISCAL DATA

Grant Number: 114-G-00-99-00154-00

Fund Account: 729/01093

Allottee Acronym: WNI9-99-22114-KG13

Resource Category: T909010, EOCC: 54101

Total Estimated Amount: $757,800
Total Obligated Amount: $750,000

USAID Project Officer: Amy Heinen, Office of Economic Restructuring

Letter of Credit Number:

USAID/CAUCASUS/CONT
FUNDS AVAILABLE
BY [signature] DATE 9/24/99

SCHEDULE ATTACHMENT 1

A. Purpose of Grant

The purpose of this Grant is to fund a program to recruit and hire two foreign Commissioners to serve on the National Securities Commission (NSC) of Georgia, as more specifically described in Attachment 2 (the Program Description) of this Grant.

B. Period of Grant

1. The effective date of this Grant is the date of the cover letter. The expiration date of this grant is December 31, 2001.

2. Funds obligated hereunder are available for program expenditures for the estimated period from the effective date of the grant to December 31, 2001, as shown in the grant budget below.

C. Amount of Grant and Payment

1. The total estimated amount of this Grant for the period shown in B.1 above is $757,800.

2. USAID hereby obligates the amount of $750,000 for program expenditures during the period set forth in B.2. above and as shown in the Grant Budget below.

3. Payment shall be made to the Grantee in accordance with procedures set forth in Attachment 3 (the Standard Provisions).

4. Additional funds up to the total amount of the grant shown in C.1. above may be obligated by USAID subject to the availability of funds, the mutual agreement of the parties to proceed, and the requirements of the Standard Provision of the Grant entitled "Revision of Grant Budget."

D. Grant Budget

The following is the Grant Budget. Revisions to this Budget shall be made in accordance with the Standard Provision of this Grant entitled "Revision of Grant Budget."

The administrative fee listed in the Budget is for ancillary administrative expenses arising in program execution and may not be applied for expenses outside the immediate management of the program. Elements recovered through the fee may not be recovered under another component of this Grant.

| | |
|---|---|
| Total Program Budget: | $807,800 |
| USAID | $757,800 |
| IBRD | $ 50,000 |
| Admin. Expenses (2%) | $ 15,156 |

E. Reporting and Evaluation

1. Technical Reports: The Grantee shall prepare brief quarterly program performance reports. One copy of each quarterly report shall be sent to the following addresses within 30 days after the end of a quarter (delivery to USAID/Caucasus is by hand):

USAID/Caucasus
20 Telavi St.
Sheraton Metechi Hotel
Tbilisi, Georgia 380003

ENI/PER – Ann Richards
RRB – Room 2.06-045
Washington, D.C. 20523

The reports shall present the following information:

- status of implementation of activities under the Grant, including any problems encountered; and,
- other pertinent information, including summary status of USAID funds and expenditures.

2. Final Report: Within 60 days following the expiration date of the Grant, the Grantee shall submit a final report to USAID covering activities during the entire period of the Grant. The report will include information on:

- the extent to which program objectives were achieved by the work under the Grant;
- problems, delays, or adverse conditions that materially affected the ability to attain program objectives, and a description of corrective actions taken; and
- lessons learned that are relevant for future similar activities.

3. Financial Reports: Unless otherwise notified in writing, the Grantee shall submit

financial reports in accordance with procedures set forth in Attachment 3 (the Standard Provisions) to: Office of Financial Management
FA/FM/CMP/LC
RRB 7700
U.S. Agency for International Development
Washington, D.C. 20523-7700

In addition, one copy of all financial reports shall be submitted to USAID/Georgia at the address stated in E.1 above.

4. The Grantee shall prepare and submit two copies of each report required by this grant to the Bureau for Program and Policy Coordination, Center for Development Information and Evaluation, Development Information Division (PPC/CDIE/DI). All documents should be mailed to:

PPC/CDIE/DI
ACQUISITION
RRB Room 6.07-106
U.S. Agency for International Development
Washington, D.C. 20523-6701

5. The title page of all reports forwarded shall include a descriptive title, the author's name(s), grant number, the project number and title, grantee's name, name of the USAID program office, and the publication or issuance date of the report.

F. Special Provisions

1. Conflicts among any of the Attachments of this Grant shall be resolved by applying the following descending order of precedence:

- Attachment 1 - Schedule
- Attachment 3 - Standard Provisions
- Attachment 2 - Program Description

PROGRAM DESCRIPTION ATTACHMENT 2

09/07/99
Attachment 2

# Proposal for funding by USAID

## Technical Assistance for Capital Market Development in Georgia Selection and Appointment of Foreign Commissioners for the National Securities Commission of Georgia

### Background

1. From being one of the most prosperous of the republics of the former Soviet Union a decade ago, by 1993, Georgia had plunged into civil war and anarchy. Normal government functions, including tax collection, were almost non-existent. Hyperinflation had reached astronomical proportions wiping out the population's savings. This was the painful start for a new country integrating into an unknown global market place.

2. 1994 was the turning point. In the short time since then, Georgia has achieved significant progress. A series of credits from international financial organizations supported the Government's structural reform agenda, which included liberalization of the price and trade regimes, reform of the banking system, privatization of state enterprises and agricultural land, and the establishment of a legal and regulatory framework conducive to private sector development. The successful implementation of these reforms and supportive fiscal and monetary policies resulted in macroeconomic stabilization and the resumption of real GDP growth in 1995, which exceeded 10 percent in 1996 and 1997. A combination of external shocks, including the regional financial crisis in the fall of 1998, and a less than satisfactory fiscal performance, temporarily put the macroeconomic program off track in early 1999.

3. In this volatile macro environment, Georgia has entered the second stage of economic reforms, and it is now crucial to build appropriate institutions and structures for sustainable private sector-driven growth. In this respect, development of capital markets in Georgia has emerged as a priority. Efforts are being undertaken in this area by both the Government and the donor community; such as USAIDs Capital Markets Development Project and the Pilot of Share Registries under the World Bank's Structural Adjustment Technical Assistance Credit (SATAC). It is imperative that all counterparts coordinate their efforts to consolidate the progress and strengthen the Government's capacity to move forward in the area of capital market development.

### Project Description

4. USAID is implementing its Capital Markets Development Project with the assistance of Barents Group. The project began in January 1998, and is expected to continue through September of 2000. Generally, the project covers the following areas:

- Assistance to the Securities and Stock Exchange Inspection Board (SIB) to assist Georgia to build the regulatory capability the National Securities Commission (NSC) would need to oversee its markets;

- Assistance in the development of a mechanism for securities trading, including the institutional and systems development required to build a modern stock exchange;

- Assistance in the creation and development of a depository system;

- Increasing public awareness and training of market participants and regulators.

5. The *Law on Securities* was passed in December 1998 and signed by President Shevardnadze in January 1999. Parliament has just passed an amendment to the Law regarding the composition of the first Securities Commission. It provides for five commissioners with staggered terms (5, 4, 3, 2, and 1 years) of whom three commissioners (with terms of 5, 4, and 3 years) would be nominated by the President and approved by the Parliament. It also allows for, on a one-time "temporary basis", the President to nominate two commissioners (for 2 and 1 year terms) who are foreign country nationals. The first three Commissioners have recently been approved by Parliament.

6. The Government of Georgia has requested the World Bank to facilitate in the recruitment of two foreign commissioners as well as to identify and obtain adequate financing for this effort – see attached letter dated August 27, 1999 from Deputy State Minister V. Chkhartishvili. Given our earlier understandings in this regard, the Bank would like to request USAID to consider financing *two foreign country national commissioners.* The term of the contractor's employment shall be as specified by USAID and the appropriate provision of the Georgian Securities Market Law (GSML). Accordingly, the contractor shall be required to participate, as a Commissioner, in various routine functions of the Commission set forth below. In this connection, the contractor shall apply his/her knowledge and experience in securities regulation to accelerate the Commission's institutional and organizational development. In short, the contractor's work with the Commission should enable the body to carry out its statutory mandate in a credible and professional manner.

7. The contractors shall be required to participate in the following routine functions of the Commission as the principal securities regulatory body of Georgia. This listing is illustrative, but not all-inclusive:

- Participation in all formal deliberations of the body of five commissioners of the Commission in accord with the GSML and the corresponding regulations, including the Commission's internal regulations.

- Such participation shall include, without limitation, deliberations on the following matters: (a) adoption of essential regulations to fully implement various provisions of the GSML, including but not limited to, regulations for licensed stock exchanges, depository institutions, self-regulatory organizations, issuers of securities, and other market participants; (b) the granting or denying of license applications submitted by entities or persons regulated directly by the Commission; (c) authorization of investigations and inspections to determine compliance with applicable laws and regulations; and in the case

of inspections, the review and transmittal of findings and remedial recommendations to the affected entities; (d) initiation and conclusion of enforcement actions, including the imposition of administrative sanctions in appropriate instances; (e) the referral of egregious matters to Georgian criminal authorities for investigation and prosecution; (f) issuance of interpretive and policy statements; (g) review and final action on proposed rule changes submitted by licensed stock exchanges, depository institutions, and self-regulatory organizations; (h) review and approval of the Commission's annual budget along with material changes in organizational structure and/or the division of responsibilities among various departments; (i) establishing essential operational policies, e.g., protection of confidential information contained in filings submitted by regulated entities and defining a media relations policy; (j) defining the Commission's role in the delivery of training; (k) the review and approval of a bank of questions used in exams administered by the Commission staff to qualify individuals for participation in the securities business in a licensed capacity; and determination of disclosure requirements for all market participants, including but not limited to, licensed stock exchanges, depository institutions, self-regulatory organizations and issuers of securities.

- The Contractors shall also provide technical assistance in a "mentor" capacity to the three Georgian Commissioners. In general terms, this mentoring should assist the Georgian Commissioners in making informed decisions in all the areas highlighted above, consistent with the legal standards articulated in the GSML.. Additionally, the mentoring process should develop management skills needed to administer the Commission's workload effectively; to hire, develop and retain capable staff; to define training needs that are critical to the staff's development; to develop realistic projections of costs and revenues as part of the annual budget process; to develop effective lines of communications among the various departments of the Commission; to develop a strategic plan to guide the Commission's institutional development over the next three years; and to define training opportunities that are appropriate to enhance the skills and overall credibility of the Commissioners.

<u>Role of the World Bank</u>

8. The World Bank would play the following role in the selection of the foreign country nationals:

- Review of Terms of Reference
- Undertaking the advertising effort for the positions
- Preparing a proposal for USAID trust funding
- Establishing the Bank's interview panel
- Interviewing candidates (in Washington DC)
- Communicating to the Government the short listed candidates with detailed interview reports
- Administering the (country-executed) Trust Fund and contracting the two selected candidates.

<u>Budget</u> (attached)

Attachment 3

STANDARD PROVISIONS

1. ALLOWABLE COSTS (JULY 1988)

1) The grantee shall be reimbursed for costs incurred in carrying out the purposes of this grant which are reasonable, allocable, and allowable.

a. Reasonable shall mean those costs that do not exceed those which would be incurred by an ordinarily prudent person in the conduct of normal business.

b. Allocable shall mean those costs which are necessary to the grant.

c. Allowable shall mean those costs which are reasonable and allocable, and which conform to any limitations set forth in this grant.

2) Prior to incurring a questionable or unique cost, the grantee is encouraged to obtain the grant officer's written determination as to whether the cost will be allowable.

2. REFUNDS (December 1996)

1) If the grantee earns interest on Federal advances prior to expending the funds for program purposes, the grantee shall remit the interest annually to USAID.

2) Funds obligated by USAID but not disbursed to the grantee at the time the grant expires or is terminated shall revert to USAID, except for such funds encumbered by the grantee by a legally binding transaction applicable to this grant. Any funds advanced to but not expended by the grantee at the time of expiration or termination of the grant shall be refunded to USAID except for such funds encumbered by the grantee by a legally binding transaction applicable to this grant.

3) If, at any time during the life of the grant, or as a result of final audit, it is

determined that USAID funds provided under this grant have been expended for purposes not in accordance with the terms of this grant, the grantee shall refund such amount to USAID.

3. REVISION OF GRANT BUDGET (JULY 1988)

1) The approved grant budget is the financial expression of the grantee's program as approved during the grant award process.

2) The grantee shall immediately request approval from the grant officer when there is reason to believe that within the next 30 calendar days a revision of the approved grant budget will be necessary for any of the following reasons:

a. To change the scope or the objectives of the program and/or revise the funding allocated among program objectives by more than ten percent of the total budget amount unless the schedule states otherwise.

b. Additional funding is needed.

c. The grantee expects the amount of USAID authorized funds to exceed its needs by more than $5,000 or five percent of the USAID award, whichever is greater.

3) Except as required by other provisions of this grant specifically stated to be an exception from this provision, the Government shall not be obligated to reimburse the grantee for costs incurred in excess of the total amount obligated under the grant. The grantee shall not be obligated to continue performance under the grant (including actions under the "Termination Procedures" provision) or otherwise to incur costs in excess of the amount obligated under the grant, unless and until the grant officer has notified the grantee in writing that such obligated amount has been increased and has specified the new grant total amount.

4. TERMINATION PROCEDURES (JULY 1988)

This agreement may be terminated, in whole or in part, by either party at any time upon 30 days written notice of termination. Upon receipt of and in accordance with a termination notice from the grant officer, the grantee shall take immediate action to cease all expenditures financed by this grant and to cancel all unliquidated obligations if possible. Further, upon receipt of notice of termination, the grantee shall not enter into any further obligations under this grant. Except as provided below, no further reimbursement shall be made after

the effective date of termination. The grantee shall within 30 days of the effective date of termination repay to the Government all unexpended USAID funds which are not otherwise obligated by a legally binding transaction applicable to this grant. Should the funds paid by the Government to the grantee prior to the effective date of termination be insufficient to cover the grantee's obligations in a legally binding transaction, the grantee may submit to the Government within 90 days after the effective date of termination a written claim for such amount. The grant officer shall determine the amount(s) to be paid by the Government to the grantee under such claim in accordance with the "Allowable Costs" provision of this grant.

5. NONLIABILITY (JULY 1988)

USAID does not assume liability for any third party claims for damages arising out of this grant.

6. AMENDMENT (JULY 1988)

The grant may be amended upon mutual consent of the parties by formal modifications to the basic grant document or by means of an exchange of letters between the grant officer and an appropriate official of the grantee.

7. NOTICES (JULY 1988)

Any notice given by USAID or the grantee shall be sufficient only if in writing and delivered in person, mailed, or cabled as follows:

To the USAID grant officer, at the address specified in the grant.

To grantee, at grantee's address shown in the grant or to such other address designated within the grant.

Notices shall be effective when delivered in accordance with this provision, or on the effective date of the notice, whichever is later.

8. PUBLICATIONS AND MEDIA RELEASES (FEBRUARY 1994)

(This provision is applicable when publications are financed under the grant.)

1) If it is the grantee's intention to identify USAID's contribution to any publication, video or other information/media product resulting from this grant, the product shall state that the views expressed by the author(s) do not necessarily reflect those of USAID. Acknowledgements should identify the sponsoring USAID Office and Bureau or Mission as well as the U.S. Agency for International Development substantially as follows.

"This [publication, video or other information/media product (specify)] was made possible through support provided by the Office of _______, Bureau for ________, U.S. Agency for International Development, under the terms of Grant No.________________. The opinions expressed herein are those of the author(s) and do not necessarily reflect the views of the U.S. Agency for International Development."

2) The grantee shall provide the relevant strategic objective or results package team with one copy of all published works developed under this grant and with lists of other written work produced under the grant.

3) Except as otherwise provided in the terms and conditions of the grant, the author or the recipient is free to copyright any books, publications, or other copyrightable materials developed in the course of or under this grant, but USAID reserves a royalty-free nonexclusive and irrevocable right to reproduce, publish, or otherwise use, and to authorize others to use the work for U.S. Government purposes.

9. AUDIT AND RECORDS (U.N. Grants) (July 1988)

a. It is agreed that the grantee will furnish the U.S. government with a final report on activities carried out under this grant, including accounting for these funds in sufficient detail to enable USAID to liquidate the grant. The report should be submitted to the U.S. Mission to the U.N. in New York for forwarding to the USAID program office.

b. It is understood that financial records, including documentation to support entries on accounting records and to substantiate charges against the grant, shall be maintained in accordance with the Grantee's usual accounting procedures, which shall follow generally accepted accounting practices. All such financial records shall be maintained for at least three years after the final disbursement of funds under this grant.

c. The Grantee confirms that the grant account will be audited in accordance with established procedures under appropriate provisions of the financial

regulations and rules of the Grantee.

10. PAYMENT (LETTER OF CREDIT) (FEBRUARY 1997)

a. Payment under this grant shall be by means of a Letter of Credit (LOC) in accordance with the terms and conditions of the LOC and any instructions issued by the USAID Bureau for Management, Office of Financial Management, Cash Management and Payment Division (M/FM/CMP).

b. As long as the LOC is in effect, the terms and conditions of the LOC and any instructions issued by M/FM/CMP constitute the payment conditions of this grant superseding and taking precedence over any other clause of this grant concerning payment.

c. The grantee should have written procedures that minimize the time elapsing between the transfer of funds and disbursement by the recipient. The grantee shall exercise prudent management of Federal funds by drawing only those funds which are required for current use. The timing and the amount of the drawdown shall be as close as is administratively feasible to the actual disbursements by the grantee for direct program or activity costs and the proportionate share of any allowable indirect costs.

d. If the LOC is revoked, payment may be made on a cost-reimbursement basis, in accordance with paragraph (f) of this clause.

e. Revocation of the LOC is at the discretion of M/FM/CMP after consultation with the grant officer. Notification to the recipient of revocation must be in writing and must specify the reasons for such action.

f. If the LOC is revoked, the grantee shall submit to the USAID Controller an original and 3 copies of SF-1034, "Public Voucher for Purchases and Services Other Than Personal" and SF-1034A, Continuation of SF-1034, normally once a month, but in any event no less than quarterly. Each voucher shall be identified by the grant number and shall state the total costs for which reimbursement is being requested.

U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT
MISSION FOR THE CAUCASUS

February 29, 2000

Joseph M. Owen
Resident Representative
World Bank Resident Mission in Georgia
18A Chonkadze Street
Tbilisi, Georgia

Subject: Grant No. 114-G-00-99-00154-00, Amendment 1

Dear Mr. Owen:

Pursuant to the authority contained in the Foreign Assistance Act of 1961, as amended, the U.S. Agency for International Development (USAID) hereby amends the subject grant to International Bank for Reconstruction and Development (IBRD) and International Development Association (IDA) (hereinafter referred to as the "Grantee"). USAID grants an additional $505,860, increasing the total of this grant to $1,263,660, to provide support for the program in Georgia described in the Schedule and Program Description of the grant, as amended.

The Schedule of the grant is amended as follows:

1. "December 31, 2001" is replaced with "February 28, 2002" in paragraph B.1.

2. "$757,800" is replaced with "$1,263,660" in paragraph C.1.

3. The grant budget in paragraph D is replaced with the following:

| *Cost Element* | *Total Estimated* |
|---|---|
| 1. Securities Commissioners | $ 887,010 |
| 2. Advisor | $ 350,500 |
| 3. Administrative Fee | $ 26,150 |
| **TOTAL USAID Contribution** | **$1,263,660** |
| IBRD | $ 140,000 |
| Total Program Budget | $1,403,660 |

The attached document, entitled "Supplemental Program Description", is appended to the Program Description of the grant.

GEORGIA: SHERATON METECHI, 5TH FLOOR, 20 TELAVI STREET, TBILISI 380003
TEL: (995-32) 92-25-47, FAX: (995-32) 00-10-13, LOCAL FAX: 822-00-10-13

AZERBAIJAN: 83 AZADLIG AVENUE, BAKU 370007
TEL: (994-12) 98-03-35, FAX: (994-12) 98-66-7[illegible]

This grant amendment is effective and obligation is made as of the date of this letter and shall apply to expenditures made by the Grantee in furtherance of program objectives during the period beginning with the effective date of the grant and ending February 28, 2002.

This grant is made to the Grantee on condition that the funds will be administered in accordance with the terms and conditions of the grant, as amended, all of which have been agreed to by your organization. Your agreement to this amendment on behalf of the Grantee will be reflected by your signature below. Please sign and date both copies of this grant and return one original to USAID.

Sincerely yours,

Michael Farbman
Grant Officer
USAID/Caucasus

Encl.

ACKNOWLEDGED:
International Bank for Reconstruction and Development and International Development Association
BY: ______________________
TITLE: ______________________
DATE: ______________________

FISCAL DATA

Grant Number: 114-G-00-99-00154-00

Fund Account: 729/01093 720/11093

Allottee Acronym: WNJ9-00-22114-KG13 WNJO-00-22114-KG13

Resource Category: T005015 - $463,660.00 T005019 - $50,000.00

Total Estimated Amount: $1,263,660
Total Obligated Amount This Action: $ 513,660
Total Obligated Amount: $1,263,660

USAID/CAUCASUS/TBILISI
FUNDS AVAILABLE
BY [signature] DATE 2/29/00

USAID Project Officer: Amy Heinen, Office of Economic Restructuring

Letter of Credit Number:

Selection and Appointment of Foreign Commissioners for the National Securities Commission of Georgia

The program description "Technical Assistance for Capital Market Development in Georgia Selection and Appointment of Foreign Commissioners for the National Securities Commission of Georgia" is modified to include the additional activities described herein.

The World Bank will provide an advisor to the National Securities Commission (NSC) for a period of one year to ensure continuity and support to the Commission during the transition period, during which a fourth Georgian Commissioner will be appointed to serve on the Commission. It is envisioned that this advisor will be the incumbent foreign Commissioner who has been appointed for the one-year term. After fully serving the one-year term, this individual shall act in an advisory capacity for an additional period of one year.

This Advisor's responsibilities will be as follows:

- Provide advice on matters including but not limited to: (a) adoption of essential regulations to fully implement various provisions of the Georgian Securities Market Law (GSML), such as regulations for licensed stock exchanges, depository institutions, self-regulatory organizations, issuers of securities, and other market participants; (b) the granting or denying of license applications submitted by entities or persons regulated directly by the Commission; (c) authorization of investigations and inspections to determine compliance with applicable laws and regulations; and in the case of inspections, the review and transmittal of findings and remedial recommendations to the affected entities; (d) initiation and conclusion of enforcement actions, including the imposition of administrative sanctions in appropriate instances; (e) the referral of egregious matters to Georgian criminal authorities for investigation and prosecution; (f) issuance of interpretive and policy statements; (g) review and final action on proposed rule changes submitted by licensed stock exchanges, depository institutions, and self-regulatory organizations; (h) review and approval of the Commission's annual budget along with material changes in organizational structure and/or the division of responsibilities among various departments; (i) establishing essential operational policies, e.g. protection of confidential information contained in filings submitted by regulated entities and defining a media relations policy; (j) defining the Commission's role in delivery of training; (k) the review and approval of a bank of questions used in exams administered by the Commission staff to qualify individuals for participation in the securities business in a licensed capacity; and determination of disclosure requirements for all market participants, including but not limited to, licensed stock exchanges, depository institutions, self-regulatory organizations and issuers of securities.

- The Advisor shall also provide technical assistance in a "mentor" capacity to the four Georgian Commissioners. In general terms, this mentoring should assist the Georgian Commissioners in making informed decisions in all the areas highlighted above, consistent with the legal standards articulated in the GSML. Additionally, the mentoring process should develop management skills needed to administer the Commission's workload effectively; to hire, develop and retain capable staff; to define training needs that are critical to the staff's development; to develop realistic projections of costs and revenues as part of the annual budget process; to develop effective lines of communication among the various departments of the Commission; to develop a strategic plan to guide the Commission's institutional development over the next three years; and to define training opportunities that are appropriate to enhance the skills and overall capability of the Commission.

U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT
MISSION FOR THE CAUCASUS

May 5, 2000

Joseph M. Owen
Resident Representative
World Bank Resident
Mission in Georgia
18A Chonkadze Street
Tbilisi, Georgia

Subject: Grant No. 114-G-00-99-00154-00, Amendment 2

Dear Mr. Owen:

Pursuant to the authority contained in the Foreign Assistance Act of 1961, as amended, the U.S. Agency for International Development (USAID) hereby amends the subject grant to International Bank for Reconstruction and Development (IBRD) and International Development Association (IDA) (hereinafter referred to as the "Grantee").

The Schedule of the grant is amended as follows:

1. "December 31, 2001" is replaced with "February 28, 2002" in paragraph B.2.

2. In the Standard Provisions, the "Payment (Letter of Credit)" clause is replaced with the following:

PAYMENT (PERIODIC ADVANCE) (OCTOBER 1991)

a. Periodic advances shall be limited to the minimum amounts needed to meet current disbursement needs and shall be scheduled so that the funds are available to the grantee as close as is administratively feasible to the actual disbursements by the grantee for program costs. Cash advances made by the grantee to secondary recipient or the grantee's field organizations shall conform substantially to the same standards of timing and amount as apply to cash advances by USAID to the grantee.

b. The grantee shall submit requests for advances (using SF-270, "Request for Advance or Reimbursement") at least monthly to the paying office specified in the grant letter. Requests

shall state the estimated disbursements to be made during the period covered by the request, less the estimated balance of cash on hand at the beginning of the period and the advance amount being requested.

c. The grantee shall submit a "Financial Status Report" (SF-269A) quarterly, no later than 30 days after the end of the period, to the paying office specified in the grant letter. The report shall show disbursements, advances received, and any cash remaining on hand for the period covered by the report. Within 90 days following the expiration of the grant, the grantee shall submit a SF-269A showing total disbursements, total advances received, and any cash remaining on hand, which will be refunded to USAID.

d. If at any time, the USAID Controller determines that the grantee has demonstrated an unwillingness or inability to: (i) establish procedures that will minimize the time elapsing between cash advances and the disbursement thereof, (ii) timely report cash disbursements and balances as required by the terms of the grant, and (iii) impose the same standards of timing of advances and reporting on any sub-recipient or any of the grantee's overseas field organizations; the USAID Controller shall advise the grant officer who may suspend or revoke the advance payment procedure.

This grant amendment is effective as of the date of this document. This grant was made to the International Bank for Reconstruction and Development and the International Development Association with the understanding that IDA will manage the funds for the proposed activity in Georgia. The amount of this grant remains unchanged. This grant was made to the Grantee on condition that the funds will be administered in accordance with the terms and conditions of the grant, as amended, all of which have been agreed to by your organization. Your agreement to this amendment on behalf of the Grantee will be reflected by your signature below. Please sign and date both copies of this grant and return one original to USAID.

Sincerely yours,

Michael Farbman
Grant Officer
USAID/Caucasus

ACKNOWLEDGED:
International Bank for Reconstruction and Development and International Development Association
BY: ______________________________
TITLE: ______________________________
DATE: ______________________________